Ready? Thank you, Your Honor, and may it please the Court. My name is Michael Stark, and I represent the appellant, Mr. Michael Formica. A molar fell out of Mr. Formica's mouth on October 19, 2014. It didn't have to. Mr. Formica had been complaining of problems regarding that tooth for more than 10 months, and twice during that time, a jail dentist referred him to an outside dentist for treatment. The defendants knew about all this, but they allowed the molar to rot out of Mr. Formica's mouth because he didn't have enough money in his inmate account to cover the cost of outside treatment. This is sufficient to establish deliberate indifference to a serious medical need under the Eighth Amendment as the magistrate properly held. Mr. Formica's claim regarding the molar is best understood chronologically, beginning on June 13, 2014. On this day, he received a diagnosis from a jail dentist of a cavity that was large enough to have spread to the pulp, which is the connective tissue at the center of the tooth, and at that time, the dentist recommended that Mr. Formica be referred to an outside facility in order to save the tooth. He told Fit Mr. Formica as much during the visit. Without consulting the jail dentist, the defendants refused to send Mr. Formica out, insisting that he must have enough money in his inmate account to cover the cost of treatment before seeing the dentist. At this point... I looked at the timeline, I guess, of this case, and would you say that the timeline has been extended from February 10, 2012 to July 27, 2015? That's about right, Your Honor. Yes, if you... That's about it? Yes, that's correct. And then, within that timeline, at least by my count, correct me if I'm wrong, when Mike saw dental professionals on at least 14 occasions, 14 occasions? I can't say exactly 14, but that sounds about right, Your Honor. So sometimes those dental professionals were just the dentist in the facility, in the penal facility, and sometimes they were an outside oral surgeon. But I wonder, how does the... How does somebody... How can it be deliberate indifference when you had dental professionals both inside and the outside? What is the timeline that you and I both agreed is the relevant timeline for this case? I guess where I would part ways a little bit, Judge Wilkinson, is while we would acknowledge that that is the lifespan of the case, when he first complained of one tooth to when he had the final tooth removed... Please move it a little over... Better? Okay. I think there are a couple of critical junctures within that timeline where the evidence is that I was just referring to. Because at that juncture, the jail dentist made a specific determination, June 13th of 2014, and the note from that visit is JA-335. Now that's about tooth number five. That's about tooth number five, which is the molar. You got a better argument on tooth number five than you have on tooth number 32. I'll agree with that, Judge King. I think we have a better argument there. All right. I might be sympathetic with you on Defendant Pitts, but how does Dyer and Iler stay in the case? We'll acknowledge that it's a closer call with respect to Dyer. There is evidence in the record indicating that Dyer worked in consultation with Nurse Pitts, particularly with respect to the decision about what to do in the June of 2014 visit, which, as we'll contend, is probably the critical visit in which their behavior evidenced deliberate indifference. But with respect to Nurse Pitts, I think we're constrained to acknowledge that she was far more involved, and we have far more evidence. He has a pretty attenuated involvement. It seems to me when you went after him, you were sort of going after him on a respondent superior basis. And you and I both know that 1983 doesn't operate on a respondent superior basis. I don't think we're going after him on a respondent superior basis. I think it's supervisory liability. That's what it sounded like to me, because I thought his involvement was pretty attenuated. Well, there are two separate defendants other than Nurse Pitts, just so we're clear when we're talking. Superintendent Ehler is the superintendent against whom we've asserted a claim under supervisory liability. But you don't have much of a case against the superintendent. I wouldn't say we don't have much of a case. We will acknowledge that we don't have a case against the superintendent with respect to the Wisdom Tooth, which was first, because we don't really have it. Is that number 32? That's tooth number 32. But your best case is against Pitts. Our best case is against Pitts with respect to the molar. That's correct, Judge King. With respect to tooth number 5. Tooth number 5. We'll use the numbers. That's right. Oh, God. With respect to what? Tooth number 5. That's the second tooth that was removed. That's the one that broke off and got infected and abscessed and everything. That's correct. You're right, Judge King. That's right. So, I'm sorry. But with respect to your question regarding Superintendent Ehler, we do have a supervisory liability claim against him, which is this Court's Shaw case. That's pretty hard to make. I'll acknowledge that it is pretty hard to make and the evidence in this record isn't particularly strong and, in fact, probably non-existent with respect to the Wisdom Tooth. But we do have evidence, particularly in Mr. Formica's complaints, of failures to receive treatment prior to the events beginning with respect to the molar. And so, at that point, we have notice. Well, you know, Formica is not blameless in this matter and, as I say, it's sort of odd for me to sit on somebody who sees dental professionals on 14 occasions as being treated with indifference. But a lot of these appointments were canceled because of Formica and one was canceled because he refused to pay a $5 co-pay. That's not a lot of money, huh? Well, no. He just refused to pay it. I mean, this guy, let's put it this way, this guy's jerking the system around because when you look at the number of cases he's filed, the number of cases he's got pending in Greene County and the number of cases he's filed at the Virginia Court of Appeals, he's filing claims with courts and requests and everything, I mean, it's prolific. And somebody, you know, somebody can say with this litigious, litigious history that, oh, you know, he's just blowing smoke again because, you know, somebody only filing a complaint once in a good while, you say, well, you know, he's not a chronic complainer, there must be something that's worth looking into. But if every time you turn around, somebody's whining and complaining about something, that's a different, you know, that's a different story. And we all know, you know, whatever the organization is, we all know chronic whiners. And I certainly don't disclaim the existence of chronic whiners, Judge Wilkinson, but it seems to me that a lot of those determinations are determinations pertaining to Mr. Formica's credibility, which are inappropriate for either this court or the district court to resolve at this procedural posture. We do have objective documented medical evidence that is sufficient to support a claim in this case. So without regard to what he may have done in other cases. Why is he canceling all these appointments? Well, one, he refused to pay $5 copay, and then another is canceled because he refuses, he refuses to take the antibiotics in preparation for the procedure. They were going to go ahead with the procedure, but no, oh no, he wouldn't take the antibiotics. And of course, a physician is not going to go ahead with, you know, with dental procedures, there's a high rate of infection. We all know that. And if somebody, I don't blame a dental professional with not going ahead with the procedure if somebody is refusing to take the standard antibiotics, and that was a problem. And another was rescheduled, another appointment was rescheduled because the blood sugar levels indicated it would be dangerous to give him anesthesia. And that's, you know, that's something that I can't imagine a surgeon going ahead in the anesthesia. You know what happens in that. They break out, they get into comas, and they don't recover. That's what these people are doing. And you know, you may disagree with their diagnosis, and you may disagree with their course of treatment, but the doctors aren't before us here. But this, so many of these appointments, he's a very uncooperative patient. And there's a lot going on there, Judge Wilkinson. I think the key point, though, is all of the events that you described pertaining to the lowering of the blood pressure level, the alleged refusal to take antibiotics, and his cancellation of the appointment for failure to pay $5 occurred outside of where we contend the core of the violation took place. Because even if you were to assume... Where the core violations took place? The core violation began on June 13th of 2014. And as I was saying a second ago, that is the time at which he was diagnosed by a dentist, and this is in the record, of having a large cavity with possible tissue involvement. And at this point, the dentist referred him to an outside facility for treatment. At this point, both elements of the claim are established. First, he had an objectively serious medical injury, not just a minor cavity, but a large cavity that was large enough to have spread to the tissue. The nurse said that they were going to schedule an appointment with an outside surgeon once he had the money in his account. That's correct, Your Honor. And our contention is that's a violation of prison policy, and that is not the order in which it should have occurred. If an injury rises to the level of being a serious medical injury, and courts have recognized that cavities can be when they get large enough, and because they deteriorate, prison policy dictated that rather than wait on him to have the money in his account to prepay for the cost of treatment... But the prison policy isn't an embodiment of an Eighth Amendment standard. Violation of a prison policy is certainly some evidence of violation of an Eighth Amendment standard. And at this procedural posture, the fact that it's some evidence should have been sufficient to allow both the trial court, should allow the trial court to deny the defendant's motion for summary judgment with respect to this claim and allow him to get to a jury. Is it your contention that Pitts was defying the policy or didn't understand it? Our contention isn't that she didn't understand it, but she was acting in contravention of the policy. Which was that if you need treatment, you get the treatment whether you can pay for it or not. Right. That's exactly right. Well, it's not whether you can pay for it or not, Your Honor. They won't be denied treatment. Well, I guess that is accurate. You'll get it regardless of whether you can pay for it. But it does provide for, in instances where... I mean, it depends on what you're getting treated for. I mean, if somebody's having a heart attack, they're going to treat them. That's correct, Your Honor. What he had here was an abscessed tooth. At one point it was. Broken tooth. A broken tooth. That's correct, Your Honor. And he should have been treated before. Now, the prison policy does provide for a mechanism so that he wouldn't get free treatment. So you're saying she was ignorant of it? We're not saying that she was ignorant of it. We're saying she was deliberately indifferent to it, which is critical in the Eighth Amendment inquiry. Well, you're saying that. You know, it's a funny thing to me because when you read Justice Thurgood Marshall's opinion in Estelle v. Gamble, he talks about how rare this is supposed to be, these Eighth Amendment claims. And slowly they're just sliding over into a negligence standard. And that's not consistent with where Justice Marshall... It's not consistent. All you need to do is read the opinion and you'll understand how exceptional this is supposed to be. And then you look at some of these other circuit opinions, and I think the opposing counsel points to this Berry v. Pruitt Amendment. The inmate had unremitting and steadily worsening dental pain over months, causing headaches, problems eating and sleeping, being unable to drink water, but the jail nurse and doctor  And they talk about the other circuit cases, talk about people can't eat, people can't sleep, pus is regularly oozing from an infection. They're all more dramatic circumstances, suggesting of an emergency than here. I mean, here there are three, four months, the lapse between requests and things where there don't seem to be any particularly acute problems. There may have been negligence. You may disagree with the diagnosis. You may say that they should have performed this sooner or should have performed this later. But, you know, none of us get a dental appointment on the very day we wish it. I have to wait a good bit of time in some cases, unless it's an emergency. If I could just make two points, Your Honor. The first is that the evidence here establishes culpable conduct beyond negligence. Based on both the June and September notes in 2014, nurse pits in consultation with Major Dyer should have been aware that treatment at an outside facility was the only way to correct Mr. Formica's problem and prevent the tooth from falling out of his mouth. Now, I understand there are some... Not aware. That's a reasonable person standard and that's negligence. Well... You just expressed the negligence standard to me. But certainly the jury... Deliberate indifference is not a standard of should have been aware. It's a standard of was aware and deliberately decided, consciously decided nothing to do about it. But what you just expressed to me, and this is what concerns me about these cases, you just expressed to me a reasonable person standard, which is a hallmark of negligence. It probably should have been aware, it may not have been the best choice of semantics, Your Honor. But again, these notes... Those are the words you use. Yeah, and that probably wasn't the best word choice. But as we expressed in our brief, these notes were sufficient to tell her that the only way to treat Mr. Formica's dental condition was to send him to an outside facility. And as this Court's recognized many times, a jail defendant can't bury their heads in the sand and avoid gaining the information that they need to arise at knowledge. That's the MacDese case, and that's also in King v. Rubenstein. So our submission is that Mr. Formica has evidence beyond just negligence here, with respect to both June and September. And to the last point, I know that there's no evidence in any of the cases, the circuit cases throughout, that an infection is required. Here we have a tooth that started as a cavity and fell out of his mouth. The other circuit dental cases show something much more acute than we have here. And our submission is that because his tooth fell out of his mouth, that's sufficient under the other circuit cases, Your Honor. With that, I will yield the balance of my time. Thank you, Judge. Ms. Johnson. Good afternoon. May it please the Court, my name is Carlene Johnson. I'm here on behalf of a local jail, Central Virginia Regional Jail, retired Superintendent Ehler, then Major Frank Dyer, and LPN Nurse Pitts. I point out that this is a local jail because I think that context is important. What do you mean by a local jail? Local jail. A local jail is comprised, it's a regional jail that was created to better serve more economic . . . What about a multiple county jail, is that what you're saying? Yeah, a few . . . Where is this located? It's in Orange. It serves a few rural counties, Orange, Madison, Havana. I distinguish it, Your Honor, from a Department of Corrections facility, for example, where Mr. Formica is now, and I checked over the weekend and apparently he's going to be there until 2027. I think in the context of something like dental care, it matters whether it's in the context particularly of a local facility. This particular local jail, unlike many local jails, decided to have a dental program where a dentist could come in and help serve the inmates who were there, intended to be for  He was in there for a long time. He was in there for a long . . . I mean, all this was going on for three and a half years. Over about three years, which is unusual, Your Honor. He had one conviction, he wouldn't have been there for very long, and then as I think Judge Conrad pointed out in a footnote, he was convicted on a couple of additional charges while he was . . . You're saying he should have been in a prison or something? He was appealing things. I think he's got . . . you all have, I think, a few before you as well. He has a lot of habeas corpus petitions. There's a lot of appeals. He has multiple charges. He ended up being in there longer than one would expect, but it is unusual, frankly, for a local jail to even have a dental program. So they had a dentist who would come in periodically, including who could do extractions. I don't know if he . . . You better disband the dental program at this point because you're going to get hooked with the Eighth Amendment claim for having it. Well, I was going to point out, it's no good deed goes unpunished, frankly, because that is the case here, and I'll tell you, it has long been hard . . . this is not anything we need the record for. I think it's a matter of common sense. It's hard to get professionals, medical professionals, to come in from the outside and deal with the inmate population and provide any care to them because they don't want to get sued. And while those of us who have been doing . . . and any penal facility to attract a dentist. It is terribly hard, but one thing, the pay ain't all that great, and for another thing, you don't know . . . you're serving what might be a population with some difficult individuals in it. You're going to get sued, and holding people deliberately indifferent on these kind of things is going to compound the difficulties because it is . . . being in a penal facility is the job that dentists least want to have. And even, Your Honor, apart from the dentist coming into the facility, but getting an outside oral surgeon to accept these patients is difficult. And in fact, you see some of that in this record when, with respect to the tooth number five, Judge King, the one that I think the appellant is keyed on, it's a tooth up here. You start counting from the right. One is up here, upper right. You count across to 16. You drop down. This is 17, the wisdom tooth. You go across to the right hand. That's the other wisdom teeth. Those are the first two wisdom teeth that Mr. Formica initially had out. He had them both out at the same time. He'd only complained about 32. But with the outside oral surgeon, even when he was scheduled to go to the outside oral surgeon, they have to keep these appointments confidential ahead of time for security reasons. You don't want the inmates to know when they're going to be transported outside. The oral surgeon's office canceled the appointment because people had been calling the oral surgeon's office, including somebody who was representing themselves to be Mr. Formica's mother, and an imposter person representing themselves to be from another dentist's office, and asking all kinds of details about his appointment. And so there's also a letter in the record that Mr. Formica wrote to that oral surgeon because the reason that Mr. Formica said that tooth number five had become a problem for him, which the jail dentist did not see, he saw him twice in six months, saw no problem with that tooth. But Mr. Formica said, and there's a letter to the oral surgeon, that he wanted to go to the oral surgeon because he was blaming the oral surgeon for having knocked out a filling from tooth number five when the oral surgeon had done the surgery on wisdom teeth number 17 and 13 back in January. So that difficulty that you point to, Your Honor, Mr. Wilkinson, Judge Wilkinson, with respect to getting dentists is not even restricted to those coming into the jail, but to get oral surgeons to do this. Another appointment had to be rescheduled due to security reasons because, as I understand it, the oral surgeon was receiving telephone calls from Formica's family and others impersonating another dentist's office. Exactly. And it had to be rescheduled. This is a very difficult patient. These circumstances are difficult to begin with. And when somebody refuses to take the antibiotics and somebody refuses a $5 co-pay, and in other cases they're perfectly neutral reasons like a low blood sugar level that would cause any – you don't operate on people with low blood sugar levels because it dramatically increases the risk of stroke and coma and all kinds of other things. As the record reflects, Your Honor, the whole time that Mr. Formica was at Central Virginia Regional Jail, he was also being seen by other medical professionals both in the jail and he was taken to the UVA heart and vascular specialist clinic. He was in the chronic care unit at the jail. He was seen regularly by the jail physician, Dr. Sheets, and he was also taken periodically. There are records in the record that reflect that where he was seen by a heart specialist there. He was on warfare and it was a blood clotting mechanism that they had to monitor. And so he's being given all of this care and I have to remind Your Honors that this is a rural, local jail, and yet he's being given all this care. And with respect to – I think, Judge King, you had made a reference to the 2-5 having had an abscess at some point. In the record, it shows that when the jail dentist actually was examining that tooth in November of 2014, he said it was not abscessed. He was worried that it might become abscessed. And because of when the x-ray at that point showed that the root was near the nerve, he thought – Is that before it broke off? When he saw – you've got to get down in the weeds with this record, and I'm sorry, Your Honor, to have to back up a little bit in answering the question. But it was in June of 2013. We'll start with the date the appellant is looking to now. Mr. Formica wanted to see the jail dentist. He said he wanted to check and make sure there was no infection. The jail dentist looked at the tooth. There was gross decay, that there was a – part of the crown was missing. The record reflects going back years with respect to Mr. Formica. His teeth – none of his teeth were in the best of condition. He had gross decay. The jail dentist was told that the heart specialist had taken Mr. Formica off his warfare and his Coumadin, his blood thinner, and therefore, the jail dentist said, okay, fine, we should extract – because I can do this in-house. You're not on the blood clotting medication anymore, I don't have to worry about that. So he was scheduled for October 31st of 2014 for the jail dentist in-house to extract tooth number five. But that was when Mr. Formica had been refusing to take his antibiotics. The jail dentist didn't want to proceed. He rescheduled it for two weeks later. And when the jail dentist took X-rays again on that date – and they're not charging Mr. Formica for any of these X-rays or any of these examinations. The point you make about a local jail is a fair one because there are very few local jails, given the economies of it and everything, that can afford to have a dental program. And they're going to – they are going to – if the – if he prevails on a case like this when he's a very difficult patient, when he's been seen this many times, and they are strung up on deliberate indifference, you can tell exactly what municipal counsel is going to – and state lawyers – are going to advise local jails. And that is, it's not worth it. Don't try it. All you're doing is buying litigation for yourself. And it's – sometimes you can be well-meaning about things and there can be serious, sad, unintended consequences. And anybody can tell you that among the many reasons that dentists don't want to go into these local jails is because of the prospect of, in addition to treating folks who could or could not be problematic, you face this enhanced prospect of litigation, which affects your insurance, it affects this, it affects that, and it's a sad situation. It is, Your Honor. And I – you know, many of us, we see a lot of these – Mr. Formica was allegedly a pro se plaintiff below – You were talking about October 31st. My notes said that on October 31st, they determined that the crown on – the jail dentist determined that the crown on tooth five was completely gone, but the root remained. That's when they found it had been broken off. And he was going to extract it. It was – And then it went back on the 14th. Back on the 14th. It had an X-ray. Right. May 14th, November, had an X-ray. Right. The dentist determined that the extraction could be difficult due to the curvature of the root, and he recommended a referral to the oral surgeon. Exactly. And that was when Major – Until it went with number five. Right. That's when Major Dyer and Nurse Pitts both went to Superintendent Ehler and said, we have this person who ordinarily – We pay this jail dentist to come in and do these extractions because the curvature of the root – We – You know, the jail dentist wants to be careful. He doesn't want an abscess to develop, wants to send him to the outside to have the extraction done. Superintendent Ehler approved that. The appointment was set up for January 5th by the oral surgeon. There were the security concerns because people were calling, asking about the appointment, purporting to be dentists and family members of – Then he finally saw the oral surgeon on January the 22nd. Right. And the oral surgeon diagnosed a retained abscessed root and recommended extraction under a general anesthesia. And then the oral surgeon – That's what the oral surgeon did. Scheduled it for February 23rd, so it clearly wasn't too much of an emergency even for the oral surgeon. He finally took it out on July 27th. Without problem in – When he was in the Department of Corrections, five and a half months after he went into the Department of Corrections, he had a comprehensive exam when he first went into the Department of Corrections early February 2015, showed that he had no significant issues at all, just the most minimal level of ordinary maintenance, dental treatment necessary. Five and a half months later, they took out the root without any problem, as Mr. Formica admits in the record. And so to call it an abscessed tooth as if it was an abscessed tooth this whole time – And there was never any infection in the Department of Corrections. It's not that it was an abscessed root. An abscessed root. The first person to have that diagnosis was the oral surgeon, and he even then rescheduled the procedure with the oral surgeon for a month later. When he was transferred into the Department of Corrections, it wasn't done until five and a half months after that. The sad thing is there's so many people in the general population with more serious dental problems than this, by far, who very regrettably are not being seen by anyone. Because most health insurance policies, very few of them carry dental care as a – very few of them reimburse that. And the reason is that, you know, the claims are just very frequent and the premiums are sky high. And people – most insurance policies don't offer dental care, and the ones that they do are way too expensive for folks to afford. And unfortunately, members of the general population are experiencing dental problems to my great regret that are really serious, much more so than here. And they go for years and years without being seen, and that's a shame. And by comparison, this isn't half bad. It's certainly not deliberate indifference. I would agree. It's a very high standard. Just a couple of things additionally that are very unusual about Mr. Formica, apart from his litigiousness, which he certainly is, but he was represented below that he was a pro se plaintiff. And I've pointed to some things in the records because his documents – in fact, he even got a motion for an extension of time to respond to the summary judgment motion at JA 395 by telling the court, well, I have my papers prepared by somebody in Texas, and they have to have time to send them back to me. And there are Texas postmarks on these records that are mailed to the court throughout the record here. And also, there are a number of references long before appointed counsel on the appeal and long before even the lawsuit was brought where Mr. Formica is referring to how he didn't sign a refusal for the medical appointment that he had, the dental appointment he had on it, because his counsel told him it would look bad if he were going to bring a lawsuit. With respect to the refusal, Your Honor, for the co-pay, actually, they weren't going to make him pay the co-pay. They were just going to charge as a negative against his balance, but he didn't want to do that. And there's a reference in the record to him saying that his lawyer thought it would look bad for a lawsuit if he had done that. One of the questions I have for you is that the actual dentist here, the jail dentist and the oral surgeon, are they defendants in this case? They are not. Okay. And they've never been sued? Huh? They haven't been sued? Not with respect to Mr. Formica, not as far as I know. Sometimes they don't find out because it hasn't been served yet, but not as far as I know. Mr. Formica did sue the company that made the chicken fried steak, which is what he was blaming for the tooth number 32 that he said was broken. They broke it off eating the steak? That's what he said. But the jail dentist examined it, and it wasn't broken, it was just... The question I have is the dentists themselves are not defendants here? Correct. All right. So does your point about, which I think is generally a very, very good one, about chasing dentists out of the local jails and all the rest, does that still obtain if the dentists were not the defendants? Sure, because we have a situation where, as Your Honor had raised, where we had a jail trying to do a good thing here, you know, trying to have some dental care for people that were coming into a local jail, whether they're going to be released afterwards, going to the Department of Corrections, and yet they can't get people because... And also, you know, frankly, in a different sort of case, it would have been nice to have an affidavit from the jail dentist, but, you know, the real world is, people out there don't think, oh, it's just another pro se inmate case, it doesn't matter. Jail dentists get involved, they voluntarily provide an affidavit, they get sued, they've got to report it to their malpractice insurer. It's not a game for them. And with Mr. Formica, who sues every single person he can think of, it seems, including the maker of the chicken fried steak that he says... He didn't sue the dentist? We don't want him to sue the dentist. I don't want to raise the dentist's head any more than I have to. I, you know, thank goodness. Your point is, he didn't sue the dentist. Thank goodness. It's the silver lining, and Dr. Page is still at present willing to come, but it's hard. The point is, somebody hires the dentist and someone who works, and other folks work with the dentist, the dentist will know that the next case, they're probably going to be sued, and at any rate, the people that work with the dentist, the prison staff have been sued, and the jail superintendent's been sued, the nurse has been sued. So there's still all kinds, this kind of suit, whether the dentist is sued or not, it still establishes all kinds of disincentives for jail personnel, both at the local and state level, I guess it's jointly funded, not to have a dental program. That's the problem, and it's endemic that these Eighth Amendment suits are chasing away dental programs in the jails that are caring and trying to care for inmates, and God bless the dentists who go in there and try to help with this situation, but if we keep getting these sorts of suits, they're going to say, in light of all the other problems, why should we take on this kind of work? It's just, you know, and it's disagreeable to be sued no matter by whom, and it's not the kind of thing that people are looking for in their professional vocations. Doctors and dentists live in dread of being sued, and here is something they can be sued, if this is deliberate indifference, then jail personnel or dentists or whatever could be sued at the drop of a hat, and they are, physicians and dentists are so worried about the effect on their professional reputations and their malpractice insurance rates and everything that if you pile this on the different problems and the different obstacles that are facing medical personnel who seek to help, not only in dentistry, but in all kinds of medical situations that occur with unfortunate frequency in penal facilities, we're going to be driving them out, and it's going to compound the difficulties. I think there's a bit of that pretty explicitly on the record here, where the dentist had first said that he could take out, you know, he extracts teeth, that's what he's called and paid by the jail folks to do for the inmates, and he was going to extract Mr. Formica's tooth, the tooth number five, and then change his mind, and that's why I think the meeting occurred with the supervisory personnel, why are you changing your mind, because let's face it, some of the doctors aren't treated the best, especially Mr. Formica who's angling for a claim, why are you now wanting to refer somebody out rather than doing it inside when we're already paying, is the jail paying the dentist to do that inside, but in any event, they referred him out to the outside surgeon, but you're right, it gets used against you, your local jail dentist, if he's afraid of getting sued, is just going to refer them all out to outside people every time anything that ordinarily is routine and could be done in the jail could be treated. But they're going to be reluctant to take on inmates, because I can tell you this, dentists can choose what patients they want to treat, they're not obligated to treat anybody who refers someone to a dentist, that doesn't mean that the dentist is going to see them, they can say no to anybody. They are not obligated to take my kind of insurance in a number of places I will call, or take new patients at all, and we all hear that in the ordinary public. I have not mentioned at all with respect to all the places in the record where Mr. Formica makes a point of talking in great detail, including things signed by his dad about how much money his family has, and that they're willing to help him, but it's in the record, Your Honor. Unless you have any more questions for me, my time is up, I'm afraid. Thank you, Your Honors. Mr. Stark, you have some rebuttal time. Thank you, Your Honor. I'll make two key points on rebuttal, both of which I think show why this case is just circumstances are particularly severe. The first is the severity of Mr. Formica's injury. I think this is more than just a cavity. When he was first diagnosed by a jail dentist with respect to the molar, it was noted that he had not just a cavity, but a large cavity that had risked spreading to the connective tissue at the center of the tooth. Three months later, after having been referred out to an outside facility, the tooth literally rotted out of his mouth. That is sufficient under the case law. It's more than just a cavity, and I think both the Berry case from the Seventh Circuit, which talks about a dead tooth, and then the Harrison case from the Second Circuit, which talks about a large cavity that's allowed to expand over time, show why this is a particularly severe injury. This is even before we get to the... But, okay, but you're talking to, they may have been sloppy. They may have misjudged the situation, but that just sounds traditionally a negligence. There's a difference, Your Honor, with respect to culpability, and I'd like to draw that out. There's a difference between negligence, even negligence rising to the level of malpractice on the part of jail personnel, which everybody acknowledges... Malpractice is a negligence standard. I agree with that, Your Honor, and we acknowledge that those are not actionable under the Eighth Amendment. If it's just malpractice, you lose. Everybody acknowledges that if it's just a malpractice case, we could not prevail under the Eighth Amendment deliberate indifference standard. It has to rise... A known risk. It has to be a known risk. A serious risk. It has to be a deliberate indifference to a serious medical need. The word serious is in there. Now, you know, the situation with his teeth is not an ideal situation, but on the other hand, as I understand it, it's different when they were seeing him from the kind of infection or the kind of situation that raised serious dental problems. Because if you look at the general population and the percentage of them that are experiencing tooth decay, it's very large. And this is an order of magnitude greater than just simply somebody having tooth decay. This is a tooth that decayed to the point that it literally rotted out of his mouth as confirmed by a jail dentist later. And as cases throughout the country recognize, that in and of itself is sufficient to establish a serious injury under the Eighth Amendment. Now, setting aside the question of whether it's a serious injury, I think it's important to address the culpability standard. It's more than just negligence here. And I think this Court's decision in Jackson v. Leitze does a good job of that. It differentiates... And Mr. Jackson had claims against jail personnel, and this Court found that he didn't state claims because those claims sounded in negligence. They were essentially malpractice claims. But he also asserted claims against jail staff who failed to simply put in orders that the doctor had ordered. That, this Court found, was sufficient to establish deliberate indifference. And that's what we have here. On two separate occasions, in June and September of 2014, a jail dentist referred Mr. Formica out for treatment at an outside facility. He did not receive that treatment. The jail staff, not the dentist, but the jail staff did not consult with the dentist to determine that, yet they were on notice of the severity of condition and they failed to send him out for recommended treatment. That is different. That is more than just medical negligence. It's the difference between, you know, if a coach calls a play and it's run incorrectly versus not running the play at all or ignoring the play. Here the play was ignored, and this Court has found that that rises to the level of deliberate indifference. The reasons for postponing the appointments had to do with whether he could pay for them, did they? Well, yes, at one point it was whether he was, it's unclear whether he was unwilling or unable to pay the $10 co-pay, but it's beyond dispute that he himself was unable to pay. He said that he had the money to pay. There's no indication. My father's leaving for Holland and then South Africa. He wants to know how much to send, the money. This is definitely not about money. My father makes plenty, plenty of money. He has no problem with the bill. So they're saying, well, okay, you repeatedly represent that you have plenty of money to do this, pay. There's a temporal component to that, Your Honor. We're not saying he's entitled to free medical care. It's a question of timing. Do you provide treatment for the serious and deteriorating condition first or do you collect money first? If it doesn't rise to the level of a serious injury, it may well be reasonable to insist on prepayment. Our contention is, though, it was patently unreasonable in this circumstance to insist on prepayment. All I can say is that in the real world, people follow these decisions and particularly in the context of local jails, you're going to receive less medical and less dental care. It's going to be less, exactly the opposite result of what we all wish would obtain. Thank you. Thank you, Your Honor. Your court appointed Mr. Stark and I want to thank you on behalf of the court for the very able manner in which you presented your case. We are most appreciative. Thank you, Your Honor. And we will adjourn court and come down and greet counsel.
judges: J. Harvie Wilkinson III, Robert B. King, Henry F. Floyd